IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 75846-2-I |
| MICHAEL F. GULIZIA | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | UNPUBLISHED OPINION |
| and | ) | |
| | ) | |
| SVETLANA B. LAUREL | ) | |
| | ) | |
| Appellant. | ) | FILED: April 23, 2018 |

SCHINDLER, J. — Svetlana Laurel appeals the dissolution decree, findings of fact and conclusions of law, and the order granting reconsideration. Laurel argues the court erred in characterizing the house as community property and denying her request for an equitable lien and a disproportionate share of the community property. Laurel also contends the court did not have the authority on reconsideration to order the sale of the house. We affirm in all respects.

Marriage

Svetlana Laurel has a degree in computer science. Michael Gulizia has a degree in aerospace engineering. The couple met while working at the Boeing Company in Houston, Texas and began dating in January 1998. Gulizia and Laurel married on December 31, 2001 and have two children, N.G.G. and N.M.G.

In 2004, Gulizia and Laurel relocated to California to work for Boeing. Laurel sold her house in Houston and they bought a house in Costa Mesa, California. In 2005, Gulizia and Laurel relocated to work for Boeing in Washington and bought a house in Kent.

Gulizia and Laurel separated in January 2015. On August 6, Gulizia filed a petition for dissolution. The court entered a temporary parenting plan designating Laurel the residential parent. The court appointed Lynn Tuttle to conduct a parenting evaluation. Tuttle recommended the court designate Gulizia as the residential parent.

Trial

The two-day trial began on August 17, 2016. The primary dispute was designation of the residential parent. Laurel challenged the recommendation of the parenting plan evaluator to designate Gulizia as the residential parent. Laurel also requested the court distribute the home and bank accounts based on the "56/44 income disparity between the parties."

Laurel asserted she was entitled to an equitable lien of $95,000 for her contribution of separate funds to purchase the Kent house. Laurel claimed there was "no equity in the house after you take into account the down payment that came from her separate property funds." Laurel's attorney told the court that neither party had obtained a real estate appraisal and suggested the court could order an appraisal at the end of trial. The court rejected the suggestion, stating, "I'll make a ruling based on the evidence that's presented to me."

Several witnesses testified at trial, including Tuttle, Laurel, and Gulizia. The court admitted into evidence more than 30 exhibits, including a Wells Fargo Bank account statement, a BECU account statement, two Citibank account statements,

2

documents related to the sale of the Houston house, the purchase agreement for the Costa Mesa house, the mortgage statement for the Kent house, Boeing retirement and pension plan statements for Gulizia, and Ameritrade and T. Rowe Price investment statements for Gulizia. Laurel did not present "any documentation" or evidence about her retirement or investment accounts at trial.

There was limited trial testimony about the house and property distribution. Laurel testified she used "only [her] sole funds" to buy the house in Houston and received "about $90,400" when she sold the house. Laurel said they used the funds from the house in Houston to buy the Costa Mesa house and the house in Kent.

Laurel testified about necessary repairs for the house in Kent. Laurel said the "water damage needs to be fixed," the carpets and hardwood floors need to be replaced, there are holes in the walls, and the house "needs to be repainted inside and out." Laurel obtained repair estimates to replace the roof, 28 double-pane windows, the concrete porch and driveway, a wood deck, and the fence. Laurel testified that as of August 16, 2015, the balance on the outstanding mortgage on the Kent house was $145,762.

Laurel admitted she did not "allow [Gulizia] to have the home appraised." Instead of a real estate appraisal, Laurel sought to introduce a "comparative market analysis" prepared by two realtors with a "suggested list price for the house." The court denied admission of the exhibits but allowed Laurel to testify as to the value of the house. Laurel testified the house "could bring about $400,000, but all of these repairs need to be done prior to that." Laurel testified she was not "planning to stay in the house" and asked the court to "include the cost of sale in the reduction of valuation" because the sale "will eventually happen."

Laurel testified that the two Citibank accounts with community funds totaled approximately $363,000 and $395,000. Laurel admitted she transferred community funds of $40,000 to her separate Wells Fargo account and in "late 2015-2016," Laurel purchased a 2015 Lexus RX450 hybrid for $55,000. Laurel testified that she has a Boeing 401(k) retirement fund, a Boeing pension plan, "Ameritrade accounts," and one E*TRADE account but did not present any evidence on valuation. Laurel asked the court to distribute all the property "[a]ccording to income."

Gulizia did not dispute Laurel owned the house in Houston. Gulizia testified he and Laurel bought the Costa Mesa house with "a hodgepodge of the proceeds from the Houston house" and joint funds. Gulizia said they used proceeds from the Costa Mesa house to buy the house in Kent.

Gulizia testified that an upstairs shower in the Kent house "leaked into the butler's pantry" in 2013 and the "hardwood floor and the walls were damaged." Gulizia said they received "6 or $7,000" from the home insurance company but Laurel would not agree to hire the contractor. Gulizia testified that other than the floors and walls, the house did not "need any other repairs." Gulizia testified that the work estimates Laurel obtained are "home improvements . . . not necessary to sell the house." Gulizia wanted to "be bought out for [his] share of the equity" in the Kent home.

Gulizia said he attempted to obtain an appraisal of the home but Laurel refused to allow the "appraiser in the house." Gulizia introduced a Zillow estimate of the value of the Kent house. The court denied admission of the exhibit but allowed Gulizia to testify about the proposed value. Gulizia testified that if sold as is, the value of the home is $455,000. Gulizia submitted a Kelley Blue Book value for his 2008 Toyota Sienna. Gulizia testified that he has savings accounts at BECU.

During closing argument, Gulizia asked the court to follow the recommendation of the parenting evaluator and designate him the residential parent. Gulizia argued Laurel did not "overcome the community property presumption" that the Kent house is community property. "There is zero evidence as to what they sold the California home for, zero evidence as to what they bought the Washington home for, [and] nothing to show how the money moved along." Gulizia asserted Laurel tried to "deflate the home's value" with optional maintenance and repair estimates. Gulizia asked the court to order Laurel to pay "one half of the . . . net value of the home."

Laurel argued the court should maintain "the current plan" and designate her as the residential parent. Laurel asserted the children have "thrived with this existing plan" because Laurel is the "sole provider of the educational benefits" and is "the sole person . . . involved in doing all of these activities." Laurel argued she was entitled to an equitable lien of approximately $90,000 and the court should divide the assets on a "disproportionate basis" because there is a "disparate amount of income."

The court entered a dissolution decree, findings of fact and conclusions of law, a parenting plan, and a child support order. The court designated Laurel the residential parent. As agreed to by the parties, the court awarded Laurel the Kent house. The court found the Kent house was a community asset and Laurel did not carry her burden of establishing the right to an equitable lien.

> The division of real property described in the order is fair, just, and equitable. Both spouses agreed that the court should award the Kent Property to the Respondent. And in their proposed orders, both spouses proposed the language that the court uses in section 8.2 of the Final Divorce Order.
>
> . . . .

5

> The division of community personal property described in the final order is fair, just, and equitable. In their proposed orders, both spouses proposed the property division that the court makes in sections 8 and 9 of the Final Divorce Order.

The court ordered Laurel to "refinance or sell the family home" and pay Gulizia $148,983 "to buy [him] out of his equity" in the residence.

The court awarded Laurel the two Citibank accounts and the Wells Fargo Bank account. The court awarded Gulizia the BECU bank accounts. The court awarded each party their separate retirement, pension, and investment accounts. The court awarded Gulizia the 2008 Toyota Siena and Laurel the 2015 Lexus RX450 hybrid.

Laurel filed a motion for reconsideration. Laurel argued the order to pay Gulizia $148,983 was not supported by the evidence. Laurel asserted the court ignored her contribution to the equity in the house, did not take into account the need for "substantial" repairs to the house, and erred in ordering an equal distribution of the community funds. Laurel argued the court should use the income from the "Washington Child Support Schedule Worksheet" to distribute the community property. In response, Gulizia argued Laurel did not overcome the presumption that the house community property and the evidence supported the court's "50/50 division of the assets."

The court granted reconsideration in part. The court rejected the argument that Laurel was entitled to an equitable lien.

> [Laurel] did not submit evidence of (1) whether they made a down payment when they bought the Kent house, (2) the amount of any down payment, or (3) what funds they used to make any down payment. The law presumes that the Kent house is community property and there is not competent trial evidence to overcome this presumption.

The court also rejected the argument that it erred in ordering a 50/50 distribution of community assets. The order states the court considered the factors set forth in RCW

26.09.080 in making a just and equitable distribution of property. However, based on Laurel's testimony that she planned to sell the home and move to south Seattle, the court concluded the "most just and equitable resolution is for the house to be sold and the proceeds split between the parties." The court ordered Laurel to sell the house by March 1, 2017. The order states each party shall receive "50 percent of the net proceeds." Laurel appeals.

Adequacy of the Record

Laurel has the burden of presenting an adequate record for review. In re Marriage of Rhinevault, 91 Wn. App. 688, 692, 959 P.2d 687 (1998). As an appendix to her brief, Laurel attaches trial exhibit 29, "Gulizia - Property and Debt Chart - 7/15/16." Exhibit 29 lists "Property," including the value of four bank accounts, the 2008 Toyota and the 2015 Lexus, and the Kent house. The record reflects the court admitted over 30 exhibits, including many financial documents. But Laurel did not designate any exhibits. The failure to designate exhibits and provide an adequate record compromises our review on appeal. In re Parentage & Custody of A.F.J., 161 Wn. App. 803, 806 n.2, 260 P.3d 889 (2011). Because we are unable to review the exhibits admitted at trial, our review is limited to the trial record. RAP 9.6; Happy Bunch, LLC v. Grandview N., LLC, 142 Wn. App. 81, 90, 173 P.3d 959 (2007).

Characterization of Property

Laurel argues that the court abused its discretion by characterizing the Kent residence as "wholly community property." Laurel asserts she is entitled to an equitable lien for her contribution of separate funds.

In a dissolution action, all property, both separate and community is before the court for distribution. In re Marriage of Farmer, 172 Wn.2d 616, 625, 259 P.3d 256

7

(2011). The court determines the character of property at the time of acquisition. In re Estate of Borghi, 167 Wn.2d 480, 484, 219 P.3d 932 (2009). A party may rebut the community property presumption by offering clear and convincing evidence that the property was acquired with separate funds. In re Marriage of Chumbley, 150 Wn.2d 1, 5, 74 P.3d 129 (2003). "[R]eal property purchased with both community funds and clearly traceable separate funds will be divided according to the contribution of each." Chumbley, 150 Wn.2d at 8.

The court's characterization of property as separate or community presents a mixed question of law and fact. In re Marriage of Schwarz, 192 Wn. App. 180, 191-92, 368 P.3d 173 (2016). We review factual findings supporting the characterization for substantial evidence. In re Marriage of Mueller, 140 Wn. App. 498, 503-04, 167 P.3d 568 (2007). "So long as substantial evidence supports the finding, it does not matter that other evidence may contradict it." In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). The ultimate characterization of property as community or separate is a question of law we review de novo. Mueller, 140 Wn. App. at 503-04.

The court found Laurel "did not submit evidence of (1) whether they made a down payment when they bought the Kent house, (2) the amount of any down payment, or (3) what funds they used to make a down payment." Substantial evidence supports the court's characterization of the Kent house as community property. There is no dispute that Laurel owned the Houston house as her separate property. Laurel testified they used "the $90,000 that [she] got in the Houston house" to purchase the Costa Mesa house. Laurel said the purchase agreement for the Costa Mesa house includes a "reference" to a bank account that was "in [her] name only." Laurel testified the

8

separate funds "eventually rolled into the house in Kent." But Laurel did not provide any documentation to support her testimony.

Laurel refers to exhibits admitted at trial related to the purchase of the Costa Mesa house but she did not submit evidence about the amount or source of any down payment made on the Kent house. Because Laurel did not designate these exhibits, we accept the court's findings as verities on appeal. Happy Bunch, 142 Wn. App. at 90.

> "The requirement of clear and satisfactory evidence . . . is not met by the mere self-serving declaration of the spouse claiming the property in question that [s]he acquired it from separate funds and a showing that separate funds were available for that purpose."

Schwarz, 192 Wn. App. at 189 (quoting Berol v. Berol, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950)).

Because the findings support the conclusion that Laurel did not overcome the community property presumption, the court did not abuse its discretion in denying Laurel's request for an equitable lien.

Valuation of Property

Laurel contends substantial and unrebutted evidence supports her testimony on the value of the Kent house. Laurel argues she presented evidence that the Kent house "is in dire need of repairs" that reduce the fair market value. Laurel contends her testimony that the house "could bring about $400,000" is evidence of value. Laurel claims Gulizia's testimony does not support the value of the Kent house as $455,000.

Laurel's argument ignores the testimony of Gulizia that not all of the repairs are necessary. An owner may testify as to the value of his property. Worthington v. Worthington, 73 Wn.2d 759, 763, 440 P.2d 478 (1968). We defer to the trier of fact on issues of conflicting testimony and the credibility of a witness. Burrill, 113 Wn. App. at

863. Here, both parties testified as to the value of the house and we will not substitute our judgment for the trial court on a factual dispute over the valuation of property. Worthington, 73 Wn.2d at 762.

Distribution of Property

Laurel contends the court erred in ordering an equal distribution of the net proceeds from the sale of the Kent house. Laurel also contends she is entitled to a disproportionate share of the community assets based on income. In a dissolution proceeding, the trial court has "broad discretion to make a just and equitable distribution of property based on the factors enumerated in RCW 26.09.080."[1] In re Marriage of Wright, 179 Wn. App. 257, 261, 319 P.3d 45 (2013).

We review the distribution of assets for manifest abuse of discretion. In re Marriage of Brewer, 137 Wn.2d 756, 769, 976 P.2d 102 (1999). A just and equitable division " 'does not require mathematical precision, but rather fairness, based upon a consideration of all the circumstances of the marriage, both past and present, and an evaluation of the future needs of parties.' " In re Marriage of Larson, 178 Wn. App. 133, 138, 313 P.3d 1228 (2013) (quoting In re Marriage of Crosetto, 82 Wn. App. 545, 556, 918 P.2d 954 (1996)). In determining whether the distribution was just and equitable, we review the overall distribution of property. In re Marriage of Rockwell, 141 Wn.2d 235, 254-55, 170 P.3d 572 (2007). "The trial court is in the best position to assess the assets and liabilities of the parties and determine what is 'fair, just and equitable under

---

[1] RCW 26.09.080 requires the trial court to consider all relevant factors including, but not limited to:
(1) The nature and extent of the community property;
(2) The nature and extent of the separate property;
(3) The duration of the marriage . . . ; and
(4) The economic circumstances of each spouse . . . at the time the division of property is to become effective.

all the circumstances.' " Brewer, 137 Wn.2d at 769 (quoting In re Marriage of Hadley, 88 Wn.2d 649, 656, 565 P.2d 790 (1977)).

The record shows the court considered the factors under RCW 26.09.080. Because Laurel did not designate the exhibits admitted at trial, we cannot review the financial information that was before the court. Therefore, we accept as a verity on appeal the court finding that the distribution of real and personal property is "fair, just, and equitable." See Happy Bunch, 142 Wn. App. at 90. Further, it is the overall division of property that must be fair, just, and equitable. But here, the record on appeal does not allow us to review the division of property in its entirety. The testimony established that Gulizia and Laurel each had retirement and pension accounts and separate investment accounts. Gulizia presented documentation of the value of his retirement and investment accounts but Laurel did not submit any documentation or testify as to the value of her accounts. Without a complete record, we conclude Laurel cannot show manifest abuse of discretion in the distribution of property.[2]

Sale of Kent House

The trial court has the authority to order the sale of the family residence in a dissolution to achieve an equitable property distribution. In re Marriage of Foley, 84 Wn. App. 839, 844, 930 P.2d 929 (1997); In re Marriage of Sedlock, 69 Wn. App. 484, 503, 849 P.3d 1243 (1993).

Citing High v. High, 41 Wn.2d 811, 252 P.2d 272 (1953), and Arneson v. Arneson, 38 Wn.2d 99, 227 P.2d 1016 (1951), Laurel contends that absent consent of

___

[2] In her reply brief and for the first time on appeal, Laurel argues she is entitled to a disproportionate distribution of the assets because she suffers from a chronic illness, fibromyalgia. We will not address an argument raised for the first time on appeal in a reply brief. See Stelter v. Dep't of Labor & Indus., 147 Wn.2d 702, 711 n.5, 57 P.3d 248 (2002) (declining to reach an issue that was not raised or briefed below); King v. Rice, 146 Wn. App. 662, 673 n.30, 191 P.3d 946 (2008) (declining to consider argument and authority made for the first time in a reply brief).

the parties, the trial court did not have jurisdiction to order the sale of the Kent house. High and Arneson are distinguishable.

In High, the record showed "the property had been bought for speculation and was worth little now but might increase in value later." High, 41 Wn.2d at 823. The court held that under the circumstances, the trial court abused its discretion in ordering the sale of the three separate tracts of land. High, 41 Wn.2d at 823. In Arneson, the court held the trial court did not have jurisdiction in the dissolution proceeding to order the sale of property for the benefit of creditors. Arneson, 38 Wn.2d at 101.

> [T]he court has no power to compel a liquidation for the benefit of creditors as an incident to a divorce decree. Nor can any of the statutory proceedings, having that as its purpose, be consolidated with a divorce action for trial.

Arneson, 38 Wn.2d at 101.

Laurel also argues the court abused its discretion by ordering the sale of the house. We review the court's decision to order the sale of the family residence for abuse of discretion. Sedlock, 69 Wn. App. at 504-05. Laurel contends the court abused its discretion because the parties did not have an opportunity to address sale of the Kent residence. The record does not support her argument. At trial, Laurel testified she was not "planning to stay in the house." Laurel testified she retained a real estate agent and was "actually looking" for a new home in the south end of Seattle. Laurel said she wanted to move to the south end of Seattle and the sale would "eventually happen."

Consistent with the testimony at trial, the court concluded the "most just and equitable resolution is for the house to be sold and the proceeds split between the

12

parties." The court order states specifically:

> The Court reaches this determination after considering all relevant factors, including those in RCW 26.09.080 and including Laurel's testimony that, with the help of a real estate agent, she is looking to sell the Kent house and move to south Seattle, a sale "that will eventually happen."

Because substantial evidence supports the decision, the court did not abuse its discretion by ordering Laurel to sell the Kent residence.

<u>Attorney Fees</u>

Laurel requests attorney fees and costs under RAP 18.1. Laurel only requested attorney fees in the last sentence of her brief. RAP 18.1 "requires more than a bald request for attorney fees on appeal." <u>Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.</u>, 134 Wn.2d 692, 710 n.4, 952 P.2d 590 (1998). We decline to award Laurel fees on appeal.

We affirm.

WE CONCUR:

13